UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| WILLIAM WEHKING, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 5:24-cv-00042-GFVT-CJS |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CHRISTOPHER TURPIN, *et al*., | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

This matter is before the Court on a Report and Recommendation prepared by United States Magistrate Judge Candace J. Smith, addressing the Motion for Summary Judgment filed by Defendants Kelsey Brown, Christopher Turpin, and Brian Crawford. [R. 21.]  In this report and recommendation, Judge Smith recommends that the Defendants' motion be denied.  The Defendants have filed several timely objections to the report and recommendation.  For the reasons that follow, the Defendants' objections will be sustained in part, and overruled in part.  Likewise, Judge Smith's report and recommendation will be adopted in part, and rejected in part.  Ultimately, however, the Court will **GRANT** the Defendants' underlying motion for summary judgment.

**I**

On August 16, 2023, Plaintiff William Wehking was detained at the Fayette County Detention Center in Lexington, Kentucky, having pled guilty to several felony offenses in state court and awaiting sentencing. [R. 1; R. 21-3; R. 21-4; R. 21-2.]  Defendants Christopher Turpin, Kelsey Brown, and Brian Crawford worked as corrections officers at FCDC, and were involved in a use-of-force incident which forms the basis of Wehking's federal complaint.  Two additional

officers, Justin Waters and Sean Velez, were also FCDC corrections officers at the time and were involved in the incident in question, but are no longer parties to the present lawsuit. [*See* R. 11.]

On August 16, 2023, officers with Corrections Response Team-1 planned and executed shakedowns and searches of Units FF, EE, and DD. [R. 21-5 at 1.]  Upon entering a unit, the inmates were directed to remain on their bunks and to not access their Barney boxes. [Id.]  The Defendants provide that, "[o]nce the unit was secured, one sub-day room at a time was placed in mechanical restraints for inmate and officer safety, pat-frisked, and relocated either to the recreation yard or to the program space, as appropriate." [Id.]  In the moments leading up to the encounter at the center of the dispute, the record indicates that Officers Brown and Crawford were located elsewhere in Unit FF, and their attention was drawn to Wehking once they heard a verbal altercation between Wehking and Waters, prompting them to intervene. [R. 21-5; R. 21-6.]

To ascertain the specific facts surrounding the encounter between Wehking and the Defendant officers, Judge Smith reviewed Sgt. Waters's bodycam footage filed in the record by the Defendants, which lasts just under 15 minutes. [R. 22; R. 21-8.]  Neither the Plaintiff nor Defendants take issue with Judge Smith's recounting of these critical facts, and so the Court will recount them below:

> The first fifteen seconds of the video show Sgt. Waters's point of view walking down a stairwell and then crossing an open area before entering Unit FF-3.  When he enters the room, he tells Wehking to "put your jumpsuit on"; Wehking is sitting on a bottom bunk wiping his nose, and it sounds like he says, "huh?"  Waters then tells him, "Put your jumpsuit on, you've got about 3 seconds otherwise you're gonna go to the hold with your boxers."  Wehking asks, "Why?" and then Waters begins to count "three, two," and Wehking says something like, "I had to get a tissue paper to blow my nose."  At that point, Wehking's hands are holding his jumpsuit, and when Waters reaches for his left arm, Wehking says, "Don't touch me, I'm not an inmate.  I'm a fucking pretrial detainee."

Waters then holds out a taser gun and tells Wehking to turn around. Wehking lifts his hands and Waters yells, "Turn around and get on the ground! Turn around and get on the ground now!  Turn around and get on the ground now! Get on the ground now!"  While Waters is yelling at Wehking, Wehking tells him, "Don't tase me … I'm epileptic," he also asks, "Why am I getting yelled at? What the fuck did I do?"  Waters again yells at Wehking, "Get on the ground now!" and Wehking yells back, "I haven't done shit.  Why are you trying to tase me?  I'm epileptic.  I haven't done shit."

At that time, another officer in a helmet with a shield enters the frame from the right, and Sergeant Brown comes from behind Waters and approaches Wehking and yells, "Get down on the ground now!"  and another officer tells Wehking, "Get up, now!"  During this exchange Wehking again says, "I haven't done shit, I grabbed tissue paper."  Brown then pulls Wehking's left arm and tells him to get on the ground, as does another officer.  The video then shows officers pulling Wehking to the ground and pulling his shirt over his head.  It is not clear if Wehking is struggling against the officers.  One of the officers yells, "Stop resisting," and an officer asks something like, "What don't you understand?" Wehking yells, "No, I don't.  I don't know what the fuck I did."  Wehking starts to say, "Let me," but the rest of his statement is unintelligible.  Wehking's glasses end up on the floor.

Once Wehking is on the ground, a red dot from the laser of Turpin's taser becomes visible on Wehking's leg.  Sgt. Turpin then yells, "Taser! Taser! Taser!" and shoots Wehking with the taser.  The sound of the taser can be heard for about five seconds.  Wehking yells something, but it is hard to discern.  Wehking is then told to turn around on the ground, but he says he cannot, and he is again told to turn around, and the officers flip him over.

Wehking then threatens to file a lawsuit and says, "I'm epileptic, you bitches.  Motherfuckers … You did all this on purpose.  I'm calling my lawyer, I'm filing a lawsuit, I warned you I'm epileptic.  I would have complied, but you all just rushed in here.  I've not done anything wrong to anybody.  You should ask, motherfuckers, before you do this shit."  Waters tells Wehking to stand up and calls for Medical.  While Wehking continues to yell, he says something about his "box," and officers roll him over and help him up.  Wehking is told that Medical will take the taser prongs out of his body.  Wehking asks for his glasses and is taken to be evaluated.

Waters tells other inmates in the room that, "This ain't no concern of you," and threatens them with the "hold" if they get in their boxes. The next few minutes of the video involve Wehking and the officers rehashing what had happened; during this exchange, Wehking says the word "box" several times. Waters tells Wagers he should have cuffed up immediately and not pulled away. During the exchange, Wehking tells the officers that he had "tensed up" to avoid "swinging on people." He also says he knows the officers "were just doing [their] jobs" and he apologizes for tensing up and being mad.

Medical then arrives. When the nurse asks for Wehking's last name, he tells her and says, "The one that's on seizure meds." Wehking also says that he had not been able to roll over while his leg was being tased. After the taser probes are out, Wehking is seen talking to the officers, and he explains that he tensed up so he would not swing on anybody because he was about to be sentenced and, since he had no fights or incidents while detailed, he wanted "to get time served and get out." He also says, "They did a good job, and it was my bad."

Brown and Waters then walk Wehking to another portion of the jail. On the way, Waters tells Wehking the incident could have all been avoided had Wehking just listened and cuffed up. Wehking tells him that he did not say that he was not going to cuff up, he just wanted to know what he did. The two men continue to talk, and Waters notes it was not "regular officers" who had been in the room, and later tells Wehking, "I could have tased you from the moment you pulled away from me, but I didn't." Wehking tells Waters that he should have cuffed up, but did not. Waters tells Wehking, "At the end of the day, I'm glad you're ok."

[R. 25 at 4-7.] Subsequent to this interaction, the Defendants provide that a search of Wehking's bunk was conducted which uncovered a partially dissolved pill. Nursing staff then identified the pill as what they "believed to be a Lortab 10." Consequently, Wehking was found to be in possession of dangerous contraband and was placed on fourteen days of Administrative Restrictive Housing.

Wehking filed the Complaint in this case on February 12, 2024. After initial screening by the Court, pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, Wehking's claims of excessive

use of force against Turpin, Brown, and Crawford were permitted to proceed, while Waters and Velez were dismissed from the suit. The remaining defendants were served and filed an Answer. After discovery, the Defendants filed a timely motion for summary judgment on September 12, 2025. On January 30, 2026, Judge Smith filed the instant report and recommendation, recommending to the undersigned that the Defendants' motion be denied. The Defendants filed several timely objections, to which Wehking responded. The matter is now fully ripe and stands submitted to the district court for review.

## II

To receive review of a magistrate judge's decision, a party must submit particularized objections to a report and recommendation within fourteen days of the date of service thereof. *United States v. Campbell*, 261 F.3d 628, 632 (6th Cir. 2001); *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984). General objections that require a judge's interpretation are insufficient to preserve issues. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). An objecting party must provide sufficient specificity "to enable the district court to discern those issues that are dispositive and contentious." *Miller*, 50 F.3d at 380. An "objection" that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply restates arguments already presented, is not an "objection" as that term is used in this context. *United States v. Vanover*, 2017 U.S. Dist. LEXIS 54869, at *3 (E.D. Ky. Apr. 11, 2017). In contrast, a specific objection must "explain and cite specific portions of the report which [the defendants] deem problematic." *Litteral v. Caraway*, 2019 U.S. Dist. LEXIS 114106, at *2 (E.D. Ky. July 10, 2019) (citing *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007)).

The Defendants filed three sets of objections in response to Judge Smith's report and recommendation, all of which are specific in nature and trigger de novo review.  First, Defendants state "[t]he Report and Recommendation improperly excuses non-exhaustion contrary to controlling law in favor of Wehking." [R. 26 at 1-2.]  Second, Defendants provide that Judge Smith's use of force analysis under the Fourteenth Amendment was misapplied in several discrete ways. [*Id*. at 2.]  Third, and finally, Defendants contend that "[t]he Report and Recommendation improperly denies qualified immunity by conflating the reasonableness analysis under Kingsley with the independent inquiry into whether the law was clearly established." [*Id*.]  Each of these objections will be addressed in turn.

Because this matter is before the Court, ultimately, upon Defendants' motion for summary judgment, the Court will briefly lay out the legal standard before proceeding in its analysis.  Under Rule 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  "[T]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  "Instead, 'the non-moving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *J.B-K.-1 v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 462 F. Supp. 3d 724, 731 (E.D. Ky.

2020), aff'd sub nom. *J. B-K. by E.B. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 48 F.4th 721 (6th Cir. 2022) (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).

Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995) (quoting *Liberty Lobby*, 477 U.S. at 255).

**A**

The Defendants' first objection contends that the report and recommendation improperly determined that a question of material fact exists as to whether Wehking properly exhausted his administrative remedies prior to suit, as required by the Prison Litigation Reform Act. [R. 26 at 3-7.] To that effect, Judge Smith denied summary judgment on these grounds, finding that "[t]his record presents a question of fact as to whether prison staff actions made the grievance procedure unavailable to Wehking." [R. 25 at 11-12.] After considering this question de novo, the Court agrees with Judge Smith's conclusion, and will adopt it accordingly.

Under the Prison Litigation Reform Act of 1995, an individual confined in any jail, prison, or other correctional facility wishing to challenge the circumstances or conditions of his confinement must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a). The statutory language of the PLRA is clear that "[n]o action shall be brought with respect to prison conditions under … any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.*

7

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007); see also *Woodford v. Ngo*, 548 U.S. 81, 85 (2002) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."); *Napier v. Laurel Cty., Ky.*, 636 F.3d 218, 222 (6th Cir. 2011) (finding that the exhaustion requirement is a "strong one"); *Fazzini v. Northeast Ohio Correctional Ctr.*, 473 F.3d 229, 231 (6th Cir. 2006); *Campbell v. Barron*, 87 F. App'x 577 (6th Cir. 2004).  Administrative remedies must be exhausted prior to filing suit and in full compliance with the agency's claims processing rules. *Woodford*, 548 U.S. at 91-92.  Thus, "an inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile to do so because his grievance is now time-barred under the regulations." *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999).

The Supreme Court has recognized, however, that the PLRA "contains its own, textual exception to mandatory exhaustion," rooted in the fact that "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies." *Ross v. Blake*, 578 U.S. 632, 642 (2016). Stated differently, "[a]n inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id*.  The Supreme Court, therefore, has recognized three circumstances in which an administrative remedy "is not capable of use to obtain relief[,]": (1) where "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; and (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.  In the Sixth Circuit, however, more than a mere assertion of

8

unavailability is required to overcome an exhaustion defense.  "Even if an inmate has evidence to show that an administrative procedure was unavailable, he is not automatically absolved from the PLRA's exhaustion requirement because this Circuit requires inmates to make 'affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable.'" *Lamb v. Kendrick*, 52 F.4th 286, 293 (6th Cir. 2022) (quoting *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015)).  "When a prisoner makes affirmative efforts to comply but does not succeed, we analyze whether those efforts to exhaust were sufficient under the circumstances." *Id*. (quoting *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)).

Failure to exhaust administrative remedies is an affirmative defense, thus the Defendants bear the burden of proof. *Jones*, 549 U.S. at 212.  "When the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012)).  An inmate must make "some affirmative efforts to comply with the administrative procedures," and the Court will analyze "whether an inmate's efforts to exhaust were sufficient under the circumstances." *Napier*, 636 F.3d at 223-24.  Summary judgment should be granted "if a defendant establishes that there is no genuine dispute of material fact that the plaintiff failed to exhaust." *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

Wehking does not dispute that he submitted his grievance form outside of the seven-day period required by the Lexington-Fayette County Department of Corrections grievance policy. [R. 23 at 1-2.]  Rather, he argues that his submission was untimely due to the unavailability of

the administrative remedy, at least within the timeframe prescribed by regulation.  In his Complaint, Wehking provides as follows:

> I asked several times for an Inmate Service form to fill out for a grievance form, was told multiple times we had no Inmate Service forms at hand so had to wait. By the time I finally received the forms I was denied twice a grievance form until[] my third try.
>
> After taking several times to get the grievance form my complaint wasn't processed due to being past 7 days.

[R. 1 at 6.]  Wehking has consistently highlighted this procedural deficiency at each stage of the litigation. [*See* R. 23 at 2.]

The Defendants, in their objection, provide that Judge Smith erred in finding that a factual dispute exists as to whether the administrative remedies were unavailable and, in turn, whether he complied with the requirements of the PLRA.  Defendants characterize Wehking's complaint as "reli[ant] on general statements of delay[.]" [R. 26 at 6.]  In Defendants view, "[Wehking] does not allege that he was misled about the grievance process or that anyone intimidated him into abandoning his claims." [*Id*.]  Defendants take further issue with the specificity of Wehking's claim, stating, "[Wehking] does not state when he requested the grievance forms that he was supposedly denied, who he made the request to, their rank or position within the jail, what he said or what they said, or where he was when he made the request." [*Id*.]  Defendants provide that "[t]he record includes evidence of a functioning grievance procedure with defined steps and deadlines, a copy of Wehking's grievance form that was submitted late, the response stating that Wehking's grievance was submitted outside of the seven-day window in which to file, and an affidavit from Corporal Nicholas Chandler from Inmate Services confirming that Wehking took no further action related to his grievance." [*Id*. at 6-7.]

Defendants' arguments do not alter the fact that a genuine factual dispute exists as to whether prison officials refused to provide Wehking with the requisite form in a timely manner, thereby rendering administrative remedies "unavailable" by virtue of the time-bar.  The fact that the Lexington-Fayette County Department of Corrections has a generally functional grievance procedure is not in dispute.  Further, the fact that Wehking submitted an untimely grievance form is likewise not in dispute.  Rather, the question is whether that procedure was made available to Wehking in the context of this dispute.  The affidavit of Officer Chandler does nothing to resolve the factual dispute.  He provides that "[o]n September 7, 2023, inmate William Wehking filed a grievance using the Lexington-Fayette Urban County Government Division of Community Corrections Inmate Complaint Form, involving the use of force on August 16, 2023[,]" and that "[o]n September 18, 2023, the grievance was returned to General Services from inmate William Wehking.  It was non-grievable because inmate William Wehking failed to comply with grievance policies and process, as it was returned past the 7-day window to file grievances after an incident." [R. 21-9.]  This assertion fails to move the needle; it merely reiterates several non-disputed facts.  It does not address Wehking's repeated assertions in the record that he attempted to obtain the form on three different occasions before prison officials gave him a copy.  In other words, the evidence in the record does not refute Wehking's assertion that the administrative remedies were unavailable within the seven-day submission window because of the "machination" or "misrepresentation" of prison officials.

Further, the record indicates that Wehking has done more than just baldly assert and unavailability argument.  Rather, the evidence suggests that he made "affirmative efforts to comply with the administrative procedures." See *Napier*, 636 F.3d at 223.  Under Wehking's recounting of the events, when faced with a refusal to provide the grievance form, he did not

11

give up; he made repeated requests for the form until he eventually received one.  Additionally, when faced with the prospect that the form submission was likely untimely, and therefore futile, Wehking submitted it anyway, and waited until it was returned as non-grievable before pursing other remedies, including this lawsuit.  At bottom, the Court is satisfied that Wehking's efforts to exhaust were sufficient under the circumstances when viewed in the light most favorable to him as the non-moving party.  Put differently, the Defendants have failed to establish that there is no genuine dispute of material fact that the plaintiff failed to exhaust.  They are therefore not entitled to judgment as a matter of law on this basis, and their objection to that effect is overruled.

**B**

The Defendants' remaining two objections relate to the merits of Wehking's claim, and specifically correspond to both components of Judge Smith's qualified immunity analysis.  The Defendants contend first that their use of force was objectively reasonable under the Fourteenth Amendment, and that their actions did not violate clearly established law. [R. 25 at 2.] Consequently, on both bases, they argue that Judge Smith erred by finding that the Defendants were not entitled to qualified immunity.  For the reasons that follow, we partially agree with Defendants' arguments, and will therefore adopt in part, but reject in part, Judge Smith's report and recommendation.

Federal "[q]ualified immunity operates to shield government officials from liability for their actions unless the officials are on notice that those actions are unlawful." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 317 (6th Cir. 2023) (citing *Occupy Nashville v. Haslam*, 769 F.3d 434, 441-42 (6th Cir. 2014)).  "Such immunity 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Getz v.*

12

*Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)).  A qualified immunity defense is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The ultimate "burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).  The district court reviews a qualified immunity claim as a question of law. *Mitchell*, 472 U.S. at 528.

To resolve a government official's qualified immunity claim, a district court must address two questions.  One, the court determines whether the facts, as alleged by the plaintiff, constitute a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Two, "the court must decide whether the right at issue was 'clearly established' at the time of the defendant's misconduct." *Id*.  The Supreme Court instructs that a district court may address these two issues in either order. *Id*. at 236.  The Court applies this framework to the arguments presented by the Defendants in their motion for summary judgment

Wehking's Complaint alleges that the Defendant officers violated the Fourteenth Amendment's Due Process Clause by subjecting him to excessive force while detained.  The Fourteenth Amendment protects a pretrial detainee "from the excessive use of force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).  In order to prevail on a Fourteenth Amendment claim, "a pretrial detainee must show only that the force purposely or knowingly used against [him] was objectively unreasonable." *Kinglsey v. Hendrickson*, 576 U.S. 389, 396-97 (2015).  "This objective standard is not to be applied 'mechanically,' and 'turns on the facts and circumstances of each particular case.'" *Guy v. Metro. Gov't of Nashville*, 687 F. App'x 471, 475 (6th Cir. 2017) (quoting *Kingsley*, 490 U.S. at 397).  A reviewing court "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective

13

reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Kingsley*, 576 U.S. at 399-400. Further, courts are cautioned to be cognizant of the fact that "[o]fficers facing disturbances 'are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *Id*. (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Thus, the Supreme Court has "stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." *Id*.

In *Kingsley*, the Supreme Court outlined several factors a court must consider to determine whether an officer's use of force was reasonable including: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. In weighing the *Kingsley* factors, the Court must do so "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight[,]" and must give deference to "policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

Turning next to the second prong of the qualified immunity analysis, "[g]overnment officials enjoy qualified immunity from suit under 1983 unless their conduct violates clearly established law." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)). "A right is clearly established when it is 'sufficiently clear that ever reasonable official would have understood that what he is doing violates that right." *Id*. "A right is not clearly established if existing precedent does not place the constitutional question

14

'beyond debate.'" *Id*. Put differently, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Zorn*, 146 S. Ct. at 930 (citing *District of Columbia v. Wesby*, 538 U.S. 48, 63 (2018)). "Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice." *Id*. (citing *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (per curiam)).

Once a defendant raises qualified immunity as a defense, "the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation." *Thomas v. Plummer*, 489 F. App'x 116, 119 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); see also *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) ("A plaintiff must satisfy both inquiries in order to defeat the assertion of qualified immunity").

**1**

At the outset, Defendants object to the fact that Judge Smith's analysis did not provide a sufficiently individualized assessment of the actions of each Defendant. This point is well-taken. "Because 'it is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct,' a court must determine whether each prison official individually met the subjective component of excessive force." *McKinney v. Lexington-Fayette Urban Cnty. Gov't*, 651 F. App'x 449, 465 (6th Cir. 2016) (quoting *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012)). In the sections that follow, the Court will provide an individualized assessment

15

of the Defendants' respective conduct and will reach an individualized determination as to each's entitlement to qualified immunity.

**2**

Next, before turning to a purely individualized assessment of the Defendants' conduct, the Court will briefly address several of the defendant-focused *Kingsley* factors which apply equally to all Defendants. First, and perhaps most critically, as Judge Smith pointed out, this is not a case where the individual suffered severe or extreme injuries because of the use of force. Although the record demonstrates that Wehking warned officers that he suffered from epilepsy and may suffer a severe reaction from being tased, he did not suffer any severe or lasting effects from the encounter. Rather, the record demonstrates that he was timely assessed by medical personnel, the taser prongs were successfully removed from his leg, and he walked with the officers to a different area of the jail on his own and without assistance. Consequently, the severity of the injury does not suggest an overly excessive use of force.

As to the severity of the security problem at issue, the Court acknowledges that the encounter occurred during a shakedown of certain portions within the jail. Such an operation naturally entails rapid and decisive action on the part of law enforcement to ensure not only their safety, but also to prevent inmates or detainees from concealing any contraband which is purpose of such an operation. To this point, courts have long recognized the discrete importance of preventing contraband from falling into the hands of detainees. See *Wolfish*, 441 U.S. at 540 ("the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees"); see also *Feeley v. Sampson*, 570 F.2d 364, 369 (1st Cir. 1978) ("as the maintenance of institutional security 'directly serves' the state's interest in ensuing the detainee's presence, jail order and security has been accepted as a

16

consideration entitled to great weight when balancing the state's interest against the civil liberty interest of detainees"). While this factor is not overly probative in this case, the Court acknowledges that the nature of the shakedown operation being undertaken at the time of the incident suggests that some force may be needed in view of the heightened need for order and compliance. The Court will now turn to its individualized assessment of the officers' conduct.

**a**

The evidence in the record fails to demonstrate that Brown or Crawford's use of force was objectively unreasonable. The conduct taken by Brown and Crawford is materially identical under the circumstances. As the situation quickly escalated between Wehking and Officer Waters, Brown and Crawford were elsewhere in Unit FF. Their attention was drawn to Wehking's room, FF-3, due to Waters's repeated verbal directives instructing Wehking to not access his Barney box and to lie on the floor and place his hands behind his back. Officer Brown specifically observed an officer with his taser drawn ordering Wehking to place his hands behind his back. Brown and Crawford entered the unit and placed Wehking involuntarily on the ground. While doing so, the officers continue to command Wehking to stop resisting, and Wehking's glasses are knocked off. Wehking attributes no physical injury to his placement on the ground at the hands of Brown and Crawford, either at the time or subsequently.

Even assuming the force applied by Brown and Crawford was sufficient to implicate the Due Process Clause of the Fourteenth Amendment, it was still objectively reasonable under the circumstances and proportionate to the problem at issue. The attentions of Brown and Crawford were drawn to the scene in light of an ongoing altercation between Wehking and Waters, in which Waters orders a non-compliant Wehking to get on the ground. Wehking physically resisted when Waters attempted to reach for his left arm. Wehking responds to Waters with an

17

explicative-laden response coupled with repeated disobedience.  This is all unfolding during a prison shakedown, in which the need to keep detainees away from their personal effects is acutely heightened.  Logic dictates that Brown and Crawford needed to use some degree of force to gain compliance.  "Permitting detainees to swear at officers and disobey routine orders undermines officers' authority, which in turn compromises security. *Beavers v. Harrison*, 2024 U.S. Dist. LEXIS 118194, at *18 (E.D. Mich. June 10, 2024) (collecting cases).  Wehking's repeated refusal to obey Waters's orders, coupled with his profanity-filled responses, gives rise to a legitimate interest in resolving the issue before it continues to escalate.  At bottom, Brown and Crawford were entitled to employ some degree of force to do so.

The degree of force employed by Brown and Crawford was limited under the circumstances.  The amount of danger facing Waters could not have been immediately apparent.  The officers again order Wehking to comply before pulling him to the ground.  After he is tased by Turpin, the officers flip Wehking over on the ground and help him up as they await medical personnel to address the taser prongs.  In other words, the officers, including Brown and Crawford, did not use any force until Wehking had repeatedly ignored verbal orders, and once force was applied, they employed the minimal amount of force needed in order to gain compliance.  As soon as Wehking became compliant, Brown and Crawford immediately ceased applying force.  Additionally, to reiterate, there is no record of physical injury, especially with respect to his placement on the ground.

At bottom, Brown and Crawford applied an objectively reasonable usage of force under the circumstances.  The force employed by these officers was proportionate to the danger at hand, under an application of the *Kingsley* factors, and constituted the least amount of force necessary under the circumstances.

Officers Brown and Crawford are entitled to qualified immunity.  Even if Wehking could demonstrate that Brown and Crawford violated his Fourteenth Amendment rights, he failed to demonstrate that the right was clearly established in responding to the Defendants' summary judgment motion.  In response to the Defendants' assertion of qualified immunity, Wehking pointed to essentially no statutes or case law demonstrating that the Defendants violated a clearly established right.  In his response brief, as to qualified immunity, Wehking cites two cases.  He cites to *City of Escondido v. Emmons*, for the proposition that "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 586 U.S. 38, 42 (2019) (citing *Kisela,* 584 U.S. at 103).  He also cites to *Haywood v. Hough*, for the equally general proposition that "the 6th Circuit denied officer's qualified immunity because they violated Haywood's Fourth Amendment rights."  [*Id.*]; see 811 F. App'x 952 (6th Cir. 2020).  These citations, however, amount to the sort of "principles stated generally" that the Supreme Court have held insufficient to demonstrate that relevant precedent is clearly established.  Furthermore, the *Haywood* case is both legally and factually distinguishable to the case at bar, as it dealt with qualified immunity in the context of claims for false arrest and an unlawful search of a hotel room in violation of the Fourth Amendment.  As to *City of Escondido*, interestingly, the Supreme Court reversed the Ninth Circuit because it erroneously "defined the clearly established right at a high level of generality" and thus improperly denied the officers qualified immunity. 586 U.S. at 43.  In other words, *City of Escondido* pushes against Wehking's argument by requiring plaintiffs to demonstrate that a right is clearly established with a relatively high degree of specificity.

In sum, Wehking failed to meet his burden of proof as to either prong of the qualified immunity analysis.  The uncontroverted facts in the record, standing alone, demonstrate that

19

Brown and Crawford employment an objectively reasonable usage of force to subdue Wehking. And, even if their usage of force was unreasonable, Wehking presented no evidence to demonstrate that the right violated was clearly established. Brown and Crawford are entitled to qualified immunity.

**b**

Officer Turpin's involvement in the incident is distinct from Brown and Crawford, in that he tased Wehking after he had been subdued. The record before the Court demonstrates that around ten seconds after Officers Brown and Crawford had placed Wehking on the ground, Turpin tased Wehking. Turpin provides he was justified in doing so because Wehking was continuing to actively resist the orders of law enforcement, even after he had been taken to the ground. Although Wehking seems to acknowledge that he was continuing to be non-compliant after being subdued, he provides this is because "he is diagnosed with PTSD which causes a different reaction when yelled at and a whole lot of commotion going on around him." Again, as already stated, Wehking sustained no injury as a result of being tased, even though he suffered from epilepsy and PTSD.

In use of force cases involving the employment of a taser, the Sixth Circuit has repeatedly stated that the question of whether the defendant was actively resisting takes on special importance. *Groth v. Hill*, 2026 U.S. App. LEXIS 7267, at *17 (6th Cir. Mar. 10, 2026); see also *Perez v. Simpson*, 83 F.4th 1029, 1031 (6th Cir. 2023) ("When analyzing excessive force, our circuit often sorts taser cases based on a simple dichotomy – was the suspect actively resisting or not?"). "If a suspect actively resists or exhibits behavior that is on the 'hazy border' between submission and active resistance, we generally grant officers qualified immunity for their tasing; conversely, if the suspect's behavior is clearly passive or compliant, as defined in our precedents,

20

we typically deny qualified immunity." *Id*. (citing *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 604 (6th Cir. 2025)).

The importance attached to the determination of whether the plaintiff was actively resisting raises a related question – what constitutes "active" resistance?  The Sixth Circuit has provided much clarity in recent years into this space.  For example, it has held that "[p]hysical struggles with the police qualify[,]" as well as "verbal hostility or a deliberate act of defiance." *Feagin*, 155 F.4th at 604.  But the Court recognizes that many cases fall between the extremes of clearly active or passive resistance.  To that effect, the Sixth Circuit provides:

> In this zone of twilight, when the evidence – viewed in a light most favorable to the plaintiff, but through the lens of a reasonable officer at the scene – presents a "complex situation[]," leaving the exact nature of the threat or degree of resistance unclear, we give officers the benefit of the doubt and excuse any reasonable mistake of judgment in deploying a taser… Said more directly, when operating "in the hazy border between excessive and acceptable force," the "proper course is to grant summary judgment to the officers" on qualified immunity grounds.

*Id*. at 604 (internal citations omitted).

Regardless, this debate is rendered academic by the fact that Wehking has put forth no evidence – either in response to the summary judgment motion or in response to the Defendants' objections – to demonstrate that Turpin violated clearly defined law.  As already discussed, Plaintiff cites to a single case for the general proposition that a "[b]ecause defendants violated plaintiff's federal constitutional rights, defendants do not qualify for qualified immunity." [R. 23 at 5.]  But this is a conclusory and self-fulfilling assertion.  At bottom, Wehking has cited nothing more than a general principle regarding the use of excessive force which falls well short of demonstrating that a clearly established right has been violated.  See *Zorn*, 146 S. Ct. at 930

21

("Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice").

Put simply, the facts surrounding Officer Turpin's use of the taser fall within that well-recognized grey area between excessive and acceptable force. This issue is rendered moot, however, by Wehking's failure to present any evidence as to the second prong of the qualified immunity analysis. Consequently, because the Plaintiff failed to offer any evidence that a clearly established right was violated, the Court must follow the Sixth Circuit's guidance and grant summary judgment to the officers on qualified immunity grounds.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Magistrate Judge's Report and Recommendation **[R. 25]** is **ADOPTED in part** and **REJECTED in part** as and for the Opinion of the Court, as stated above.

2. The Defendants' Objections **[R. 26]** to the Magistrate Judge's Report and Recommendation are **OVERRULED in part** and **SUSTAINED in part.**

   a. The Defendants' first objection is **OVERRULED,** while their second and third objections are **SUSTAINED**;

3. The Defendants' Motion for Summary Judgment **[R. 21]** is **GRANTED**.

4. Because none of Plaintiff's claims survive, this matter is **STRICKEN** and **DISMISSED** from the Court's active docket.

This the 15th day of July 2026.

Gregory F. Van Tatenhove
United States District Judge